UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY,

     Plaintiff,

v.

DHARMACON, INC. and FISHER
SCIENTIFIC INTERNATIONAL INC.

     Defendants.

Civil Action No.: 05-10156 PBS

Jury Demanded

## AMENDED COMPLAINT

Plaintiff Massachusetts Institute of Technology ("MIT") and defendant Dharmacon, Inc. ("Dharmacon") are parties to a license agreement which grants Dharmacon the right to make and sell biological material called small interfering RNA, or siRNA. This material promises to revolutionize research efforts in understanding the purposes of particular human genes and in developing gene-targeted drugs and therapies. On behalf of itself and the other owners of the rights in siRNA technology, MIT has licensed siRNA technology for use in the research field to Dharmacon and three other entities. Despite its tremendous commercial success in selling siRNA products, Dharmacon has withheld from MIT royalty payments that it is obligated to make under the parties' license agreement. This action seeks to recover damages for Dharmacon's breach of that license agreement and seeks a declaratory judgment concerning the scope of the defendants' obligation to pay ongoing and future royalties under the license agreement.

In addition, upon information and belief, Dharmacon infringes U.S. Patent 6,544,790, which is entitled "Reverse Transfection Method" (the "'790 Patent"). Reverse transfection is a

method in which a nucleic acid, such as RNA, is introduced into "lawns" of cells to study gene regulation and function. Reverse transfection is particularly useful, because it allows researchers to examine genes at a much faster rate than other available methods in an arrayed, addressable format. Therefore, reverse transfection offers researchers a revolutionary, fast and easy method to evaluate the function of large libraries of genes. Reverse transfection is an ideal format in which to array siRNA molecules to study libraries of gene function. Upon information and belief, Dharmacon employs reverse transfection methods that infringe the '790 patent. For example, Dharmacon sells kits that include reagents used for reverse transfection as well as reverse transfection libraries, such as Dharmacon's si*ARRAY* RTF siRNA Library.

## Parties

1.      Plaintiff MIT is an educational and research institution organized under the corporate laws of the Commonwealth of Massachusetts with a principal place of administration in Cambridge, Massachusetts.

2.      Defendant Dharmacon is a Delaware corporation with a principal place of business at 2650 Crescent Drive in Lafayette, Colorado. Dharmacon was formerly known as Dharmacon Research, Inc., and is currently a wholly-owned subsidiary of defendant Fisher Scientific, Inc. ("Fisher").

3.      Defendant Fisher is a Delaware corporation with a principal place of business at One Liberty Lane in Hampton, New Hampshire.

## Jurisdiction and Venue

4.      MIT, Dharmacon and Fisher are citizens of different states, and the amount in controversy exceeds $75,000. This action also arises under the patent laws of the United States,

35 U.S.C. § 1 et seq.  This court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1332 (a)(1) and 1338.

5.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (a)(2), 1391 (b) and 1400.  A substantial part of the events, acts and omissions giving rise to MIT's claims occurred in this district.

## General Allegations

A.     **siRNA Technology**

6.     This dispute involves breakthrough gene technology.  Cells that are diseased or defective often make too much of a particular protein, or make a version that has an undesirable activity or effect.  Whereas most drugs and biologics presently used to treat diseased or infected cells interact directly with proteins to block or inhibit their activity, siRNA prevents the production of the protein in the first place.

7.     The potential uses for siRNA are manifold.  siRNA is an extremely significant tool in the continuing quest to identify and catalogue the functions of our genes.  For example, if a cell expresses a protein whose activity is unknown, siRNAs can help researchers reveal the activity of the gene by demonstrating what happens to a cell when protein production is stopped. Furthermore, the research to date indicates that siRNA will be a significant material for treating and preventing disease.  For example, laboratory work has shown that if a cell is infected with a virus, siRNAs can be used to shut down the expression of viral genes, curing the infection.  In another application, if a cell is defective because of the activity of a mutant protein, or an over expressed protein, siRNAs can address the defect by preventing production of the offending protein.

**B.      The Patent Applications**

8.      MIT is a joint owner (with the Whitehead Institute for Biomedical Research, the Max Planck Gesellschaft zur Foerderung der Wissenschaften, and the University of Massachusetts) of patent applications relating to siRNA, described and claimed in U.S. Patent Application No. 09/821,832 (filed March 30, 2001), U.S. Patent Application No. 10/255,568 (a continuation application filed September 26, 2002), and Patent Cooperation Treaty application No. PCT/US01/10188 (filed March 30, 2001) (collectively the "Joint Patents"). Max Planck Gesellschaft zur Foerderung der Wissenschaften, e.V. is a co-owner of the patent rights relating to a European patent application with the European Serial No. 00126325, relating generally to the same technology (the "Max Planck Patent").

9.      Pursuant to agreements by and among MIT and the other owners, MIT is authorized to act as exclusive agent on behalf of all owners for the purposes of licensing the Joint Patents and the Max Planck Patent in the research reagent field.

**C.      The License Agreement**

10.     Beginning in the Spring of 2001, MIT, as exclusive agent for itself and the other owners, began negotiations with Dharmacon for a co-exclusive license of the siRNA technology in the research reagent field. On December 21, 2001, after lengthy negotiations, MIT and Dharmacon executed the siRNA Distributor License Agreement that is the subject of the present dispute (the "License Agreement"). A true and accurate copy of the License Agreement is attached hereto as Ex. A.

11.     The License Agreement grants Dharmacon a co-exclusive license to the siRNA technology for use or sale of siRNA products as research reagents for research and educational

purposes only.  The License Agreement is one of only four co-exclusive licenses granted by MIT on behalf of itself and the other owners to the siRNA technology for use in the research reagent field.

12.    The License Agreement requires Dharmacon to pay a running royalty of 7% on Net Sales of Licensed Products.  Licensed Products includes any products that are siRNA, regardless of how the siRNA product is selected, purified or treated and including kits that contain any siRNA component.

13.    The License Agreement obligates Dharmacon to make royalty reports and payments each quarter.

**D.    Dharmacon's Performance Under the License Agreement**

14.    As the License Agreement required, Dharmacon began paying royalties as of December 10, 2001 and continued throughout 2002 to pay the 7% royalty on all its sales of siRNA, including on the full price of siRNA contained in kits.

15.    At the end of 2002, MIT commissioned an audit in accordance with §5.4 of the License Agreement.   The audit confirmed that, with some relatively minor adjustments, Dharmacon had, throughout 2002, been reporting and paying royalties on all its siRNA products. The total royalties paid by Dharmacon for December 2001 and calendar year 2002 was $617,439.  The total due (with corrections from the audit) was $645,577.  These royalties were based on Dharmacon's sales of nearly $10 million in siRNA products.

**E.    Dharmacon's Breach of the License Agreement**

16.    After paying royalties on all its products for four quarterly royalty periods, Dharmacon abruptly announced its re-interpretation of the License Agreement.  By letter dated

August 21, 2003, Dharmacon informed MIT that Dharmacon believed it had been overpaying royalties since the Effective Date of the License Agreement and unilaterally granted itself a credit of $283,263.35 for what it claimed was an over-payment of past royalties. Dharmacon declared that it would apply the alleged credit against the reduced royalties due in the future.

17.    More specifically, Dharmacon asserted for the first time that the License Agreement excluded from royalties "Dharmacon's full prices for its combination products that incorporate value-added components and technology."

18.    Over the ensuing several months, MIT solicited from Dharmacon an explanation of its position and a list of the products that Dharmacon sought to exclude from its royalty obligation. During the parties' exchanges, Dharmacon asserted that it is not required to pay the 7% royalty on the full sales price when it sells certain of its purified siRNA products, certain siRNA products selected using Dharmacon's methods, as well as when siRNA is a component in a kit.

19.    Upon information and belief, there are three categories of siRNA products for which Dharmacon and Fisher have not paid the full 7% royalty on past Net Sales, and have refused to pay the full 7% royalty on future sales: (1) sales of kits containing siRNA products ("Kitted Products"); (2) sales of some purified siRNA products ("Purified Products"); and (3) sales of siRNA products selected using Dharmacon's selection techniques, including its "SMARTselection" or "SMARTpooling" techniques ("Selected Products").

20.    The License Agreement obligates Dharmacon and Fisher to pay the full 7% royalty on the Kitted Products, the Purified Products and the Selected Products because each of these categories constitutes Licensed Products as defined in the License Agreement.

21.    The refusal by Dharmacon and Fisher to pay the 7% royalty on all of Dharmacon's sales of the Kitted Products, the Purified Products and the Selected Products is a breach of the License Agreement.  To date, defendants' breach has deprived MIT and the other owners of the Joint Patent and the Max Planck Patent of millions of dollars in revenue. Defendants' continued breach, if not cured, will cause MIT and the others continuing harm in the form of lost royalties.

## Count I - Breach of Contract

22.    MIT realleges, and incorporates by reference, the allegations contained in paragraphs 1 to 21 above.

23.    In the License Agreement, Dharmacon was granted a co-exclusive license to siRNA technology and agreed that it would pay running royalties at the rate of 7% in Net Sales of all Licensed Products, which include all of its Kitted Products, Purified Products and Selected Products.

24.    MIT has performed its obligations under the License Agreement.

25.    Dharmacon has failed and refused to pay the full amount of the running royalties due under the License Agreement.

26.    MIT has suffered, and will continue to suffer, substantial damage as a result of Dharmacon's breach of contract.

## Count II - Declaratory Judgment

27.    MIT realleges, and incorporates by reference, the allegations contained in paragraphs 1 to 26 above.

28.     Both Dharmacon and Fisher have failed to honor, have disputed, and are likely to dispute in the future, Dharmacon's obligation to pay running royalties at the rate of 7% on Net Sales of all Licensed Products, including all of Dharmacon's siRNA products.  Specifically, Dharmacon and Fisher refuse to acknowledge their ongoing obligation to pay a 7% royalty on the full sales price of the Kitted Products, the Purified Products and the Selected Products.

29.     The parties' dispute over Dharmacon's and Fisher's obligations with respect to royalty payments under the License Agreement is a ripe and justiciable case or controversy that can be resolved by this Court.

30.     MIT is entitled to a declaration by this Court: 1) that Dharmacon and Fisher are in breach of the License Agreement for their non-payment of all amounts due and that MIT presently has the right to, and in its sole discretion may, now terminate the License Agreement; and 2) declaring Dharmacon's and Fisher's obligations to continue to make running royalty payments under the terms of the License Agreement until such date that MIT provides written notice of termination of the License Agreement.

**Count III – Patent Infringement**

31.     MIT realleges, and incorporates by reference, the allegations contained in paragraphs 1 to 30 above.

32.     U.S. Patent 6,544,790, which is entitled Reverse Transfection Method, is assigned to Whitehead Research Institute for Biomedical Research ("Whitehead").  Whitehead is the owner of all right, title and interest in and to the '790 patent.  Based on an agreement between Whitehead and MIT, MIT is the exclusive licensing agent for Whitehead and has the exclusive right to enforce the '790 patent.

33.   The defendants use one or more of the methods claimed in the '790 patent in the ordinary course of business, and make, use, sell and/or offer for sale products that infringe the '790 product.  For example, Dharmacon employs reverse transfection methods that infringe the '790 patent.  Dharmacon also sells kits that include both reagents used for reverse transfection as well as reverse transfection libraries, such as Dharmacon's si*ARRAY* RTF siRNA Library.

34.   On information and belief, the defendants infringe the '790 patent.

35.   On  information and belief, the defendants induce the infringement of one or more of the claims of the '790 patent.

36.   The defendants are still infringing and will continue to do so unless enjoined by the Court.

37.   MIT has incurred, and will continue to incur, damages as a result of the defendants infringement of the '790 patent.  MIT has been, and will continue to be, irreparably harmed unless the defendants are enjoined by this Court from the actions complained herein, and MIT is without an adequate remedy at law.

### **Request For Relief**

WHEREFORE, MIT prays for judgment against Dharmacon and Fisher as follows:

(a)   ordering Dharmacon and Fisher to account for its sales of all siRNA products, and to pay as damages the full amount of royalties due on those products under the License Agreement;

(b)   ordering Dharmacon and Fisher to pay interest on the damages award as required by Section 4.2(c) of the License Agreement;

(c)    ordering Dharmacon and Fisher to pay interest on the damages award in the form of post-judgment interest;

(d)    declaring that Dharmacon and Fisher are obligated to pay a 7% royalty on Net Sales of all siRNA products, including the Kitted Products, the Purified Products and the Selected Products;

(e)    declaring that the defendants have infringed, contributed to or induced the infringement of, the '790 patent;

(f)    preliminarily and permanently enjoining the defendants, their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them from any act of infringement of the '790 patent;

(g)    awarding monetary damages, together with interest, to compensate MIT for the past infringement by defendants of said patent, and that, in light of the nature of the infringement, increasing three times the amount of the damages found or assessed;

(h)    awarding MIT its costs and reasonable attorney's fees in respect thereto in accordance with 35 U.S.C. §§ 284-85; and

(i)    granting MIT such other relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38 (a) and (b), MIT demands a trial by jury on all issues so triable.

Respectfully Submitted,

Massachusetts Institute of Technology

By its Attorneys,


/s/ Steven M. Bauer
Steven M. Bauer (BBO# 542531)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110-2600
Phone:  617-526-9600
Fax:      617-526-9899

April 5, 2005

Ver. 5/8/00

Last Modified:  12/14/01
TLO:   IA/GB/TRI



# MASSACHUSETTS INSTITUTE OF TECHNOLOGY

*and*

# DHARMACON RESEARCH, INC.

# siRNA DISTRIBUTOR LICENSE AGREEMENT

## TABLE OF CONTENTS

R E C I T A L S ...............................................................................................................1
1. Definitions.................................................................................................................2
2. Grant of Rights...........................................................................................................6
3. COMPANY Diligence Obligations. ..........................................................................7
4. Royalties and Payment Terms. ...............................................................................8
5. Reports and Records. .................................................................................................10
6. Patent Prosecution......................................................................................................12
7. Infringement...............................................................................................................13
8. Indemnification and Insurance...................................................................................13
9. No Representations or Warranties. ............................................................................15
10. Assignment. ..............................................................................................................15
11. General Compliance with Laws................................................................................16
12. Termination...............................................................................................................17
13. Dispute Resolution....................................................................................................18
14. Miscellaneous. .........................................................................................................19
APPENDIX A ..................................................................................................................22
APPENDIX B ..................................................................................................................23



**Ver. 5/8/00**

## MASSACHUSETTS INSTITUTE OF TECHNOLOGY
## CO-EXCLUSIVE PATENT LICENSE AGREEMENT

This Agreement, effective as of the date set forth above the signatures of the parties below (the "EFFECTIVE DATE"), is between the Massachusetts Institute of Technology ("M.I.T."), a Massachusetts corporation, with a principal office at 77 Massachusetts Avenue, Cambridge, MA  02139-4307 and Dharmacon Research, Inc. ("COMPANY"), a corporation, with a principal place of business at 1376 Miners Drive, Lafayette, Colorado 80026.

R E C I T A L S

WHEREAS, M.I.T. Whitehead Institute for Biomedical Research ("WHITEHEAD"), Max Planck Gesellschaft zur Foerderung der Wissenschaften e.V. ("MAX PLANCK") and University of Massachusetts ("UMASS") are joint owners of certain JOINT PATENT RIGHTS (as later defined herein) relating to M.I.T. Case No. 8768W (WHITEHEAD Case No. WI00-06, MAX PLANCK Case No. GI 2716 KTM and UMASS Case No. 01-36) "RNA Sequence-Specific Mediators of RNA Interference", by David P. Bartel, Phillip A. Sharp, Thomas Tuschl, and Phillip D. Zamore and has the right to grant licenses under said JOINT PATENT RIGHTS, subject only to a royalty-free, nonexclusive non-transferable license to practice the JOINT PATENT RIGHTS granted to the United States Government for government purposes;

WHEREAS, MAX PLANCK has authorized GARCHING INNOVATION GMBH ("GI") to act as its agent for the purposes of licensing its ownership position of JOINT PATENT RIGHTS and has authorized M.I.T. to enter into this Patent License Agreement on its behalf;

WHEREAS, WHITEHEAD, MAX PLANCK, GI and UMASS have authorized M.I.T. to act as their exclusive agent for the purposes of licensing the JOINT PATENT RIGHTS and have authorized M.I.T. to enter into this Patent License Agreement on their behalf;

WHEREAS MAX PLANCK is the owner of certain MAX PLANCK PATENT RIGHTS (as later defined herein) relating to MAX PLANCK Case No. GI 2716 KTM "RNA Interference Mediating Small RNA Molecules," by Thomas Tuschl, Sayda Elbashir and Winfried Lendeckel, has the right to grant licenses under said MAX PLANCK PATENT RIGHTS; whereas MAX PLANCK's and their agent, GI, has authorized M.I.T. to act as its exclusive agent for the



purposes of licensing the MAX PLANCK PATENT RIGHTS and has authorized M.I.T. to enter into this Patent License Agreement on its behalf;

WHEREAS, M.I.T. desires to have PATENT RIGHTS developed and commercialized to benefit the public and is willing to grant a license thereunder;

WHEREAS, COMPANY has represented to M.I.T., to induce M.I.T. to enter into this Agreement, that COMPANY shall commit itself to a thorough, vigorous and diligent program of exploiting the PATENT RIGHTS so that public utilization shall result therefrom; and

WHEREAS, COMPANY desires to obtain a license under PATENT RIGHTS upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, M.I.T. and COMPANY hereby agree as follows:

## 1. DEFINITIONS.

1.1 "AFFILIATE" shall mean any legal entity (such as a corporation, partnership, or limited liability company) that controls or is controlled by COMPANY. For the purposes of this definition, the term "control" means (i) beneficial ownership of at least fifty percent (50%) of the voting securities of a corporation or other business organization with voting securities or (ii) a fifty percent (50%) or greater interest in the net assets or profits of a partnership or other business organization without voting securities.

1.2 "FIELD" shall mean commercial sale or use of the LICENSED PRODUCT as a research reagent, including in a kit format, for research or educational purposes, specifically excluding, but not limited to, the following: (1) any uses in humans; and (2) any clinical diagnostic uses.

1.3 "IDENTIFIED PRODUCT" shall mean any product or derivative thereof, sold, used, manufactured or distributed, which product or derivative elicits a positive response in assays covered by PATENT RIGHTS and which product or derivative was identified, selected, or determined to have utility in whole or in part, through the use of LICENSED PRODUCTS or LICENSED PROCESSES.

1.4 "LICENSED PRODUCT" shall mean:
  (i)      absent the license granted hereunder, would infringe one or

2



claims of the PATENT RIGHTS; or

      (ii)    is manufactured by using a LICENSED PROCESS or that, when used, practices a LICENSED PROCESS; or

      (iii)    is an RNA product of 19-23 mers.

1.5 "<u>LICENSED PROCESS</u>" shall mean any process that, absent the license granted hereunder, would infringe one or more claims of the PATENT RIGHTS or which uses a LICENSED PRODUCT.

1.6 "<u>MARKET PARTNER</u>" shall mean any third party who sells IDENTIFIED PRODUCTS under an agreement with COMPANY. This excludes AFFILIATES.

1.7 "<u>NET SALES</u>" shall mean the gross amount billed by COMPANY and its AFFILIATES for LICENSED PRODUCTS, LICENSED PROCESSES and IDENTIFIED PRODUCTS, less the following:

      (i)    customary trade, quantity, or cash discounts to the extent actually allowed and taken;

      (ii)    amounts repaid or credited by reason of rejection or return;

      (iii)    to the extent separately stated on purchase orders, invoices, or other documents of sale, any taxes or other governmental charges levied on the production, sale, transportation, delivery, or use of a LICENSED PRODUCT, LICENSED PROCESS or IDENTIFIED PRODUCT which is paid by or on behalf of COMPANY; and

      (iv)    outbound transportation costs prepaid or allowed and costs of insurance in transit.

      (v)    amounts attributed to bad debt, not exceeding one percent (1%) of the gross amount billed by COMPANY and its AFFILIATES for LICENSED PRODUCTS, LICENSED PROCESSES and IDENTIFIED PRODUCTS.

      (vi)    An allowance for sales of 19-23 mers which are not used for siRNA, not to exceed three percent (3.0%); provided that this provision is not intended by COMPANY to constitute an admission regarding the maximum percentage of sales that may in fact be non-siRNA.

No deductions shall be made for commissions paid to individuals whether they be with independent sales agencies or regularly employed by COMPANY or its AFFILIATES or its MARKET PARTNERS and on their respective payrolls, or for cost of collections. NET SALES shall occur on the date of billing for a LICENSED PRODUCT, LICENSED PROCESS or IDENTIFIED PRODUCT. If a LICENSED PRODUCT, LICENSED PROCESS or



IDENTIFIED PRODUCT is distributed at a discounted price that is substantially lower than the customary price charged by COMPANY or its AFFILIATES or its MARKET PARTNERS, or distributed for non-cash consideration (whether or not at a discount), NET SALES shall be calculated based on the non-discounted amount of the LICENSED PRODUCT, LICENSED PROCESS or IDENTIFIED PRODUCT charged to an independent third party during the same REPORTING PERIOD or, in the absence of such sales, on the fair market value of the LICENSED PRODUCT, LICENSED PROCESS or IDENTIFIED PRODUCT

Non-monetary consideration shall <u>not</u> be accepted by COMPANY or any AFFILIATE or any MARKET PARTNER for any LICENSED PRODUCT, LICENSED PROCESS or IDENTIFIED PRODUCT without the prior written consent of M.I.T.

1.8  "<u>OTHER INCOME</u>" shall mean any payments that COMPANY or an AFFILIATE receives in consideration for LICENSED PRODUCTS, LICENSED PROCESSES, and IDENTIFIED PRODUCTS including without limitation, milestone payments, fees, and other payments, but specifically excluding NET SALES , and specifically excluding income received on sales of IDENTIFIED PRODUCTS when such IDENTIFIED PRODUCTS were discovered by COMPANY or its AFFILIATES.

1.9  "<u>OWNERS</u>" shall mean M.I.T., WHITEHEAD, UMASS and MAX PLANCK collectively.

1.10  "<u>JOINT PATENT RIGHTS</u>" shall mean:
      (a)     the United States and international patent and provisional applications listed on <u>Appendix A</u> and the resulting patents.
      (b)     any patent applications resulting from the provisional applications listed on <u>Appendix A</u>, and any divisionals, continuations, continuation-in-part applications, and continued prosecution applications (and their relevant international equivalents) of the patent applications listed on <u>Appendix A</u> and of such patent applications that result from the provisional applications listed on <u>Appendix A</u>, to the extent the claims are directed to subject matter specifically described in the provisional applications, and patent applications listed on <u>Appendix A</u>, and the resulting patents;
      (c)     any patents resulting from reissues, reexaminations, or extensions (and their relevant international equivalents) of the patents described in (a) and (b) above; and
      (d)     international (non-United States) patent applications and provisional applications filed after the EFFECTIVE DATE and the relevant international equivalents to divisionals, continuations, continuation-in-part applications and continued prosecution

4



applications of the patent applications to the extent the claims are directed to subject matter specifically described in the patents or patent applications referred to in (a), (b), and (c) above, and the resulting patents.

    1.11 "MAX PLANCK PATENT RIGHTS" shall mean:

        (a)    the United States and international patent and provisional applications listed on Appendix B and the resulting patents.

        (b)    any patent applications resulting from the provisional applications listed on Appendix B, and any divisionals, continuations, continuation-in-part applications, and continued prosecution applications (and their relevant international equivalents) of the patent applications listed on Appendix B, and of such patent applications that result from the provisional applications listed on Appendix B, to the extent the claims are directed to subject matter specifically described in the patent applications listed on Appendix B, and the resulting patents;

        (c)    any patents resulting from reissues, reexaminations, or extensions (and their relevant international equivalents) of the patents described in (a) and (b) above; and

        (d)    international (non-United States) patent applications and provisional applications filed after the EFFECTIVE DATE and the relevant international equivalents to divisionals, continuations, continuation-in-part applications and continued prosecution applications of the patent applications to the extent the claims are directed to subject matter specifically described in the patents or patent applications referred to in (a), (b), and (c) above, and the resulting patents.

    1.12 "PATENT RIGHTS" shall mean the JOINT PATENT RIGHTS and MAX PLANCK PATENT RIGHTS together.

    1.13 "REPORTING PERIOD" shall begin on the first day of each calendar quarter and end on the last day of such calendar quarter.

    1.14 "TERM" shall mean the term of this Agreement, which shall commence on the EFFECTIVE DATE and shall remain in effect until the expiration or abandonment of all issued patents and filed patent applications within the PATENT RIGHTS, unless earlier terminated in accordance with the provisions of this Agreement.

    1.15 "TERRITORY" shall mean world-wide.

## 2. GRANT OF RIGHTS.

2.1 <u>License Grants</u>.  Subject to the terms of this Agreement, M.I.T. hereby grants to COMPANY and its AFFILIATES for the TERM a royalty-bearing nonexclusive license under the PATENT RIGHTS to develop, make, have made, use, sell, offer to sell, lease, and import LICENSED PRODUCTS in the FIELD in the TERRITORY and to develop and perform LICENSED PROCESSES in the FIELD in the TERRITORY.  Neither COMPANY nor its AFFILIATES shall have the right to enter into sublicensing agreements.

2.2 <u>Co-Exclusivity</u>.  In order to establish a co-exclusive period for COMPANY, M.I.T. agrees that it shall not grant more than a total of four licenses to sell and import LICENSED PRODUCTS in the FIELD in the TERRITORY or to perform LICENSED PROCESSES in the FIELD in the TERRITORY during the period of time commencing on the EFFECTIVE DATE and terminating with the last to expire of the PATENT RIGHTS.

2.3 <u>Retained Rights</u>.

(a)    <u>Owners</u>.  Owners retain the right to practice under the PATENT RIGHTS for research, teaching, and educational purposes.

(b)    <u>Federal Government</u>.  COMPANY acknowledges that the U.S. federal government retains a royalty-free, non-exclusive, non-transferable license to practice any government-funded invention claimed in any JOINT PATENT RIGHTS as set forth in 35 U.S.C. §§ 201-211, and the regulations promulgated thereunder, as amended, or any successor statutes or regulations.

2.4 <u>Most Favored Licensee</u>.  If M.I.T. has previously granted, or hereafter grants a commercial license to a third party under the PATENT RIGHTS in the FIELD under substantially more favorable terms as a whole than those in this Agreement, COMPANY may elect to terminate this Agreement and enter into a new license agreement under the same terms and conditions, as a whole, as such third party license agreement.  Whether the terms of the Agreement with a third party are substantially more favorable or not shall be judged solely by COMPANY.  This provision shall not apply to forgiveness for past infringements to reach settlement of a lawsuit or genuine dispute between M.I.T. and a third party with respect to any PATENT RIGHTS.  This provision also shall not apply with respect to any license granted to any non-profit, university or governmental agency.

COMPANY agrees and acknowledges that M.I.T. shall provide a copy of this license

6



agreement in its entirety to any non-exclusive licensee of the PATENT RIGHTS upon request of such licensee in the FIELD. M.I.T. shall provide a copy of commercial licenses granted to third parties under the PATENT RIGHTS in the FIELD to COMPANY upon the request of COMPANY.

2.5 <u>Disclosure of Other License Holders.</u> Upon COMPANY's written request, and not more frequently than once every six (6) months, M.I.T. will provide COMPANY with a report on licensees who have been granted rights to use the LICENSED PRODUCTS or LICENSED PROCESSES for internal purposes only. This report will include the number of such licensees, and their size (based on number of employees). COMPANY will keep this information confidential.

2.6 <u>No Additional Rights</u>. Nothing in this Agreement shall be construed to confer any rights upon COMPANY by implication, estoppel, or otherwise as to any technology or patent rights of M.I.T. or any other entity other than the PATENT RIGHTS, regardless of whether such technology or patent rights shall be dominant or subordinate to any PATENT RIGHTS

### 3.  COMPANY DILIGENCE OBLIGATIONS.

3.1  <u>Diligence Requirements.</u> COMPANY shall use diligent efforts and shall cause its AFFILIATES to use diligent efforts, to develop LICENSED PRODUCTS or LICENSED PROCESSES and to introduce LICENSED PRODUCTS or LICENSED PROCESSES into the commercial market; thereafter, COMPANY or its AFFILIATES shall make LICENSED PRODUCTS or LICENSED PROCESSES reasonably available to the public without significant delay. Specifically, COMPANY or AFFILIATE shall fulfill the following obligations:

(a)    Within sixty (60) days after the end of each calendar year, COMPANY shall furnish M.I.T. with a written report (consistent with Section 5.1(a)) on the progress of its efforts during the immediately preceding calendar year to develop and commercialize LICENSED PRODUCTS or LICENSED PROCESSES.

(b)    COMPANY shall make a first commercial sale of a LICENSED PRODUCT within two (2) years of the EFFECTIVE DATE.

(c)    All LICENSED PRODUCTS shall meet the following quality standards within thirty (30) days of the first commercial sale:

Seventy Percent (70%) of the RNA in each sample sold shall be of the specific length ordered, and of the correct sequence. If multiple RNA oligonucleotides are included in the sample, all RNAs must meet this standard.



Any time after first commercial sale, M.I.T. and OWNERS reserve the right to test LICENSED PRODUCTS at random intervals to assure that quality standards have been maintained.  Such testing shall be at OWNERS and Inventors expense.

(d)     COMPANY shall make NET SALES to unaffiliated third parties according to the following schedule:

| | |
|---|---|
| First Full Calendar Year after First Commercial Sale | $250,000 (Two Hundred and Fifty Thousand); |
| Second Full Calendar Year after First Commercial Sale | $500,000 (Five Hundred Thousand); |
| Third Full Calendar Year after First Commercial Sale and each year Thereafter. | $1,000,000 (One Million). |

(e)     COMPANY will make LICENSED PRODUCTS available for use by non-profit research institutions without reach-through rights to discoveries made through use of the LICENSED PRODUCTS.

In the event that M.I.T. determines that COMPANY (or an AFFILIATE) has failed to fulfill any of its obligations under this Section 3.1, then M.I.T. may treat such failure as a material breach in accordance with Section 12.3(b).

## 4.  ROYALTIES AND PAYMENT TERMS.

4.1  Consideration for Grant of Rights.

(a)     Patent Cost Reimbursement.  COMPANY shall reimburse M.I.T. on the EFFECTIVE DATE, in accordance with Section 6.2, for its actual expenses incurred as of the EFFECTIVE DATE in connection with obtaining the PATENT RIGHTS.  This payment is nonrefundable.

(b)     License Maintenance Fees.  COMPANY shall pay to M.I.T. the following license maintenance fees on the dates set forth below:

January 1, 2002               Twenty-five Thousand dollars ($25,000)



January 1, 2003          Fifty Thousand dollars ($50,000)
and each January 1 of every year thereafter
                        One Hundred Thousand dollars ($100,000)

This annual license maintenance fee is nonrefundable; however, the license maintenance fee shall be credited to running royalties subsequently due on NET SALES earned during the same calendar year, if any.  License maintenance fees paid in excess of running royalties due in such calendar year shall not be creditable to amounts due for future years.

(c)      Running Royalties.  COMPANY shall pay to M.I.T. a running royalty of seven percent (7%) of NET SALES by COMPANY and AFFILIATES.  Running royalties shall be payable for each REPORTING PERIOD and shall be due to M.I.T. within sixty (60) days of the end of each REPORTING PERIOD.  The royalty hereunder shall be due on all NET SALES made after December 9, 2001; provided, that royalties for NET SALES during 2001 shall be due at the same time as royalties for the first REPORTING PERIOD of 2002.

(d)      Running Royalties on Internal Use.  If Company uses LICENSED PRODUCTS internally, whether for its own behalf, or that of an AFFILIATE or third party ("INTERNAL USE"), a royalty shall be paid on such INTERNAL USE, calculated by treating the amount of LICENSED PRODUCTS used in such INTERNAL USE as NET SALES, and assuming a price for the LICENSED PRODUCTS equal to the non-discounted price for LICENSED PRODUCTS of the same type customarily charged by COMPANY to an independent third party during the same REPORTING PERIOD or, in the absence of such sales, a price equal to the fair market value of the LICENSED PRODUCTS.

(e)      OTHER INCOME.  COMPANY shall pay M.I.T. a total of ten percent (10%) of all OTHER INCOME received by COMPANY or AFFILIATES.  Such amount shall be payable for each REPORTING PERIOD and shall be due to M.I.T. within sixty (60) days of the end of each REPORTING PERIOD.  This royalty obligation shall survive termination of this AGREEMENT and shall remain in effect so long as COMPANY receives OTHER INCOME.

(f)      No Multiple Royalties.  If the manufacture, use, lease, or sale of any LICENSED PRODUCT or the performance of any LICENSED PROCESS is covered by more than one of the PATENT RIGHTS, multiple royalties shall not be due.

4.2  Payments.

(a)      Method of Payment.  All payments under this Agreement should be made payable to "Massachusetts Institute of Technology" and sent to the address identified in

9



Section 14.1.  Each payment should reference this Agreement and identify the obligation under this Agreement that the payment satisfies.

     (b)    <u>Payments in U.S. Dollars</u>.  All payments due under this Agreement shall be drawn on a United States bank and shall be payable in United States dollars.  Conversion of foreign currency to U.S..dollars shall be made at the conversion rate existing in the United States (as reported in the <u>Wall Street Journal</u>) on the last working day of the calendar quarter of the applicable REPORTING PERIOD.  Such payments shall be without deduction of exchange, collection, or other charges, and, specifically, without deduction of withholding or similar taxes or other government imposed fees or taxes, except as permitted in the definition of NET SALES.

     (c)    <u>Late Payments</u>.  Any payments by COMPANY that are not paid on or before the date such payments are due under this Agreement shall bear interest, to the extent permitted by law, at two percentage points above the Prime Rate of interest as reported in the <u>Wall Street Journal</u> on the date payment is due.

<u>5.  REPORTS AND RECORDS.</u>

    5.1  <u>Frequency of Reports</u>.

     (a)    <u>Before First Commercial Sale</u>.  Prior to the first commercial sale of any LICENSED PRODUCT or IDENTIFIED PRODUCT or first commercial performance of any LICENSED PROCESS, COMPANY shall deliver reports to M.I.T. annually, within sixty (60) days of the end of each calendar year, containing information concerning the immediately preceding calendar year, as further described in Section 5.2.

     (b)    <u>Upon First Commercial Sale of a LICENSED PRODUCT or IDENTIFIED PRODUCT or Commercial Performance of a LICENSED PROCESS</u>.  COMPANY shall report to M.I.T. the date of first commercial sale of a LICENSED PRODUCT and the date of first commercial performance of a LICENSED PROCESS within sixty (60) days of occurrence in each country.

     (c)    <u>After First Commercial Sale</u>.  After the first commercial sale of a LICENSED PRODUCT or IDENTIFIED PRODUCT or first commercial performance of a LICENSED PROCESS, COMPANY shall deliver reports to M.I.T. within sixty (60) days of the end of each REPORTING PERIOD, containing information concerning the immediately preceding REPORTING PERIOD, as further described in Section 5.2.

    5.2  <u>Content of Reports and Payments</u>.  Each report delivered by COMPANY to M.I.T.



shall contain at least the following information for the immediately preceding REPORTING PERIOD:

   (i)  the number of LICENSED PRODUCTS or IDENTIFIED PRODUCTS sold by COMPANY, AFFILIATES and their MARKET PARTNERS to independent third parties in each country, and, if applicable, the number of LICENSED PRODUCTS or IDENTIFIED PRODUCTS used by COMPANY and its AFFILIATES in the provision of services in each country;

   (ii)  a description of LICENSED PROCESSES performed by COMPANY and its AFFILIATES in each country as may be pertinent to a royalty accounting hereunder;

   (iii)  the gross price charged by COMPANY, AFFILIATES and their MARKET PARTNERS for each LICENSED PRODUCT or IDENTIFIED PRODUCTS and, if applicable, the gross price charged for each LICENSED PRODUCT or IDENTIFIED PRODUCT used to provide services in each country; and the gross price charged for each LICENSED PROCESS performed by COMPANY and its AFFILIATES in each country;

   (iv)  calculation of NET SALES for the applicable REPORTING PERIOD in each country, including a list of applicable deductions, including an explanation of credits taken for sales of 19-23 mers which are not used for siRNA purposes; and

   (v)  total royalty payable on NET SALES in U.S. dollars, together with the exchange rates used for conversion.

  If no amounts are due to M.I.T. for any REPORTING PERIOD, the report shall so state.

  5.3 <u>Financial Statements</u>. On or before the ninetieth (90th) day following the close of COMPANY's fiscal year, COMPANY shall provide M.I.T. with COMPANY's financial statements for the preceding fiscal year including, at a minimum, a balance sheet and an income statement, certified by COMPANY's treasurer or chief financial officer or by an independent auditor. These reports shall be kept confidential by M.I.T.

  5.4 <u>Records</u>. COMPANY shall maintain, and shall cause its AFFILIATES to maintain, complete and accurate records relating to the rights and obligations under this Agreement and any amounts payable to M.I.T. in relation to this Agreement, which records shall contain sufficient information to permit M.I.T. to confirm the accuracy of any reports delivered to M.I.T. and compliance in other respects with this Agreement. The relevant party shall retain such records for at least five (5) years following the end of the calendar year to which they pertain,




during which time M.I.T., or M.I.T.'s appointed agents, upon reasonable notice to company shall have the right, at M.I.T.'s expense, to inspect such records during normal business hours to verify any reports and payments made or compliance in other respects under this Agreement.  In the event that any audit performed under this Section reveals an underpayment in excess of five percent (5%), COMPANY shall bear the full cost of such audit and shall remit any amounts due to M.I.T. within thirty (30) days of receiving notice thereof from M.I.T.

<h3 align="center">6.  PATENT PROSECUTION.</h3>

6.1  <u>Responsibility for PATENT RIGHTS</u>  Whitehead Institute shall, in their sole discretion, apply for, seek issuance of, maintain, or abandon the JOINT PATENT RIGHTS during the term of this Agreement.  Max Planck Gesellschaft shall, in their discretion, apply for, seek issuance of, maintain, or abandon the MAX PLANCK PATENT RIGHTS during the term of this Agreement. Upon request, M.I.T. will inform COMPANY of abandonment of any PATENT RIGHTS.

6.2  <u>Payment of Expenses</u>.  Payment of all fees and costs, including attorneys fees, relating to the filing, prosecution and maintenance of the PATENT RIGHTS shall be the responsibility of COMPANY and other siRNA distributor licensees of the PATENT RIGHTS. COMPANY shall be responsible for twenty five percent (25%) of all such patent related costs, whether such amounts were incurred before or after the EFFECTIVE DATE.  COMPANY shall reimburse M.I.T. for all amounts due pursuant to this Section within thirty (30) days of invoicing; late payments shall accrue interest pursuant to Section 4.2(c).  In all instances, Whitehead Institute and Max Planck Gesellschaft shall pay the fees prescribed for large entities to the United States Patent and Trademark Office.  Should the PATENT RIGHTS be licensed in the therapeutic field of use, COMPANY'S responsibility to pay fees and costs hereunder shall be reduced by one-half, to 12.5%, for all fees and costs incurred during the period in which any therapeutic license is in effect.  Furthermore, COMPANY may elect not to pay such costs for territories other than the United States, EPC territory countries or Japan only if COMPANY gives written notice to M.I.T. that it wishes to exclude such territories from the scope of its license within sixty (60) days of notification from M.I.T. that it intends to seek patent protection in such territories.

## 7. INFRINGEMENT.

7.1 <u>Notification of Infringement</u>. COMPANY shall inform M.I.T. promptly in writing of any alleged infringement of the PATENT RIGHTS by a third party and of any available evidence thereof. Upon reasonable request, M.I.T. will inform COMPANY of any alleged infringement of the PATENT RIGHTS and of any actions the OWNERS have taken against such alleged infringements to the extent that M.I.T. becomes aware of such actions.

7.2 <u>Right to Prosecute</u>. The OWNERS shall have the right, but shall not be obligated, to prosecute at their own expense all infringements of the PATENT RIGHTS and, in furtherance of such right, COMPANY hereby agrees that the OWNERS may include COMPANY as a party plaintiff in any such suit, without expense to COMPANY. The total cost of any such infringement action commenced or defended solely by the OWNERS shall be borne by the OWNERS, and the OWNERS shall keep any recovery or damages derived therefrom, whether compensatory for past infringement or punitive.

7.3 <u>Cooperation</u>. In any infringement suit which any or all of the OWNERS may institute to enforce the PATENT RIGHTS pursuant to this Agreement, COMPANY shall, at the OWNERS' expense, cooperate in all respects and, to the extent possible, have its employees testify when requested and make available relevant records, papers, information, samples, specimens, and the like.

## 8. INDEMNIFICATION AND INSURANCE.

8.1 <u>Indemnification</u>.

(a) <u>Indemnity</u>. COMPANY shall indemnify, defend, and hold harmless the OWNERS and their trustees, officers, faculty, students, employees, and agents and their respective successors, heirs and assigns (the "Indemnitees"), against any liability, damage, loss, or expense (including reasonable attorneys fees and expenses) incurred by or imposed upon any of the Indemnitees in connection with any claims, suits, actions, demands or judgments arising out of any theory of liability (including without limitation actions in the form of tort, warranty, or strict liability and regardless of whether such action has any factual basis) concerning any product, process, or service that is made, used, sold, imported, or performed pursuant to any right or license granted under this Agreement.

13

(b)     Procedures. The Indemnitees agree to provide COMPANY with prompt written notice of any claim, suit, action, demand, or judgment for which indemnification is sought under this Agreement. COMPANY agrees, at its own expense, to provide attorneys reasonably acceptable to M.I.T. to defend against any such claim. The Indemnitees shall cooperate fully with COMPANY in such defense and will permit COMPANY to conduct and control such defense and the disposition of such claim, suit, or action (including all decisions relative to litigation, appeal, and settlement); provided, however, that any Indemnitee shall have the right to retain its own counsel, at the expense of COMPANY, if representation of such Indemnitee by the counsel retained by COMPANY would be inappropriate because of actual or potential differences in the interests of such Indemnitee and any other party represented by such counsel. COMPANY agrees to keep M.I.T. informed of the progress in the defense and disposition of such claim and to consult with M.I.T. with regard to any proposed settlement.

8.2 Insurance. Whenever COMPANY elects to obtain and carry in full force and effect commercial general liability insurance, including product liability and errors and omissions insurance, such insurance shall protect COMPANY and Indemnitees with respect to events covered by Section 8.1 (a) above. COMPANY shall obtain such insurance before any use of the LICENSED PRODUCTS or IDENTIFIED PRODUCTS in humans. Such insurance (i) shall be issued by an insurer licensed to practice in the Commonwealth of Massachusetts or an insurer pre-approved by M.I.T., such approval not to be unreasonably withheld, (ii) shall list the OWNERS as additional insured thereunder, (iii) shall be endorsed to include product liability coverage, and (iv) shall require thirty (30) days written notice to be given to M.I.T. prior to any cancellation or material change thereof. The limits of such insurance shall not be less than One Million Dollars ($1,000,000) per occurrence with an aggregate of Three Million Dollars ($3,000,000) for bodily injury including death; One Million Dollars ($1,000,000) per occurrence with an aggregate of Three Million Dollars ($3,000,000) for property damage; and One Million Dollars ($1,000,000) per occurrence with an aggregate of Three Million Dollars ($3,000,000) for errors and omissions. In the alternative, COMPANY may self-insure subject to prior approval of M.I.T. COMPANY shall provide M.I.T. with Certificates of Insurance evidencing compliance with this Section. COMPANY shall continue to maintain such insurance or self-insurance after the expiration or termination of this Agreement during any period in which COMPANY or any AFFILIATE continues (i) to make, use, or sell a product that was a LICENSED PRODUCT under this Agreement or an IDENTIFIED PRODUCT or (ii) to perform a service that was a LICENSED PROCESS under this Agreement, and thereafter for a period of five (5) years.

14



## 9. NO REPRESENTATIONS OR WARRANTIES.

THE OWNERS MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND CONCERNING THE PATENT RIGHTS, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, VALIDITY OF PATENT RIGHTS CLAIMS, WHETHER ISSUED OR PENDING, AND THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE.  Specifically, and not to limit the foregoing, the OWNERS makes no warranty or representation (i) regarding the validity or scope of the PATENT RIGHTS, and (ii) that the exploitation of the PATENT RIGHTS or any LICENSED PRODUCT or LICENSED PROCESS will not infringe any patents or other intellectual property rights of the OWNERS or of a third party.

IN NO EVENT SHALL THE OWNERS, THEIR TRUSTEES, DIRECTORS, OFFICERS, EMPLOYEES AND AFFILIATES BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING ECONOMIC DAMAGES OR INJURY TO PROPERTY AND LOST PROFITS, REGARDLESS OF WHETHER ANY OF THE OWNERS SHALL BE ADVISED, SHALL HAVE OTHER REASON TO KNOW, OR IN FACT SHALL KNOW OF THE POSSIBILITY OF THE FOREGOING.

## 10. ASSIGNMENT.

This Agreement is personal to COMPANY and no rights or obligations may be assigned by COMPANY without the prior written consent of M.I.T., except that COMPANY may assign its rights and obligations under this Agreement to an AFFILIATE or to a successor in connection with the merger, consolidation, or sale of all or substantially all of its assets or that portion of its business to which this Agreement relates; provided, however, that this Agreement shall immediately terminate if the proposed assignee fails to agree in writing to be bound by the terms and conditions of this Agreement qn or before the effective date of the assignment.

## 11. GENERAL COMPLIANCE WITH LAWS

11.1 <u>Compliance with Laws</u>. COMPANY shall use reasonable commercial efforts to comply with all commercially material local, state, federal, and international laws and regulations relating to the development, manufacture, use, and sale of LICENSED PRODUCTS and LICENSED PROCESSES.   ·

11.2 <u>Export Control</u>. COMPANY and its AFFILIATES shall comply with all United States laws and regulations controlling the export of certain commodities and technical data, including without limitation all Export Administration Regulations of the United States Department of Commerce.  Among other things, these laws and regulations prohibit or require a license for the export of certain types of commodities and technical data to specified countries. COMPANY hereby gives written assurance that it will comply with, and will cause its AFFILIATES to comply with, all United States export control laws and regulations, that it bears sole responsibility for any violation of such laws and regulations by itself or its AFFILIATES, and that it will indemnify, defend, and hold M.I.T. harmless (in accordance with Section 8.1) for the consequences of any such violation.

11.3 <u>Non-Use of OWNERS Names</u>.  Neither COMPANY nor its AFFILIATES shall use the name of "Massachusetts Institute of Technology," "University of Massachusetts", "Whitehead Institute", "Max Planck Institute" or any variation, adaptation, or abbreviation thereof, or of any of its trustees, officers, faculty, students, employees, or agents, or any trademark owned by any of the OWNERS, or any terms of this Agreement in any promotional material or other public announcement or disclosure without the prior written consent of the OWNERS.  The foregoing notwithstanding, without the consent of the OWNERS, COMPANY may state that it is nonexclusively licensed by the OWNERS under one or more of the patents and/or patent applications comprising the PATENT RIGHTS.

11.4 <u>Marking of LICENSED PRODUCTS</u>.  To the extent commercially feasible and consistent with prevailing business practices, COMPANY shall mark, and shall cause its AFFILIATES to mark, all LICENSED PRODUCTS that are manufactured or sold under this Agreement with the number of each issued patent under the PATENT RIGHTS that applies to such LICENSED PRODUCT.

16

## 12. TERMINATION.

12.1　<u>Voluntary Termination by COMPANY</u>.  COMPANY shall have the right to terminate this Agreement, for any reason, (i) upon at least six (6) months prior written notice to M.I.T., such notice to state the date at least six (6) months in the future upon which termination is to be effective, and (ii) upon payment of all amounts due to M.I.T. through such termination effective date.

12.2　<u>Cessation of Business</u>.  If COMPANY ceases to carry on its business related to this Agreement, M.I.T. shall have the right to terminate this Agreement immediately upon written notice to COMPANY.  ·

12.3　<u>Termination for Default</u>.

　　　(a)　　<u>Nonpayment</u>.  In the event COMPANY fails to pay any amounts due and payable to M.I.T. hereunder, and fails to make such payments within thirty (30) days after receiving written notice of such failure, M.I.T. may terminate this Agreement immediately upon written notice to COMPANY.

　　　(b)　　<u>Material Breach</u>.  In the event COMPANY commits a material breach of its obligations under this Agreement, except for breach as described in Section 12.3(a), and fails to cure that breach within sixty (60) days after receiving written notice thereof, M.I.T. may terminate this Agreement immediately upon written notice to COMPANY.

12.4　<u>Effect of Termination</u>.

　　　(a)　　<u>Survival</u>.  The following provisions shall survive the expiration or termination of this Agreement:  Articles 1, 8, 9, 13 and 14, and Sections 4.1(e) and 5.2 (obligation to provide final report and payment), 5.4, and 12.4.

　　　(b)　　<u>Pre-termination Obligations</u>.  In no event shall termination of this Agreement release COMPANY or its AFFILIATES from the obligation to pay any amounts that became due on or before the effective date of termination.

## 13. DISPUTE RESOLUTION.

13.1 <u>Mandatory Procedures</u>. The parties agree that any dispute arising out of or relating to this Agreement shall be resolved solely by means of the procedures set forth in this Article, and that such procedures constitute legally binding obligations that are an essential provision of this Agreement. If either party fails to observe the procedures of this Article, as may be modified by their written agreement, the other party may bring an action for specific performance of these procedures in any court of competent jurisdiction.

13.2 <u>Equitable Remedies</u>. Although the procedures specified in this Article are the sole and exclusive procedures for the resolution of disputes arising out of or relating to this Agreement, either party may seek a preliminary injunction or other provisional equitable relief if, in its reasonable judgment, such action is necessary to avoid irreparable harm to itself or to preserve its rights under this Agreement.

13.3 <u>Dispute Resolution Procedures</u>.

(a)    <u>Mediation</u>. In the event any dispute arising out of or relating to this Agreement remains unresolved within sixty (60) days from the date the affected party informed the other party of such dispute, either party may initiate mediation upon written notice to the other party ("Notice Date"), whereupon both parties shall be obligated to engage in a mediation proceeding under the then current Center for Public Resources ("CPR") Model Procedure for Mediation of Business Disputes (http://www.cpradr.org), except that specific provisions of this Article shall override inconsistent provisions of the CPR Model Procedure. The mediator will be selected from the CPR Panels of Neutrals. If the parties cannot agree upon the selection of a mediator within fifteen (15) business days after the Notice Date, then upon the request of either party, the CPR shall appoint the mediator. The parties shall attempt to resolve the dispute through mediation until the first of the following occurs: (i) the parties reach a written settlement; (ii) the mediator notifies the parties in writing that they have reached an impasse; (iii) the parties agree in writing that they have reached an impasse; or (iv) the parties have not reached a settlement within sixty (60) days after the Notice Date.

(b)    <u>Trial Without Jury</u>. If the parties fail to resolve the dispute through mediation, or if neither party elects to initiate mediation, each party shall have the right to pursue any other remedies legally available to resolve the dispute, provided, however, that the parties expressly waive any right to a jury trial in any legal proceeding under this Article.



13.4  <u>Performance to Continue</u>.  Each party shall continue to perform its undisputed obligations under this Agreement pending final resolution of any dispute arising out of or relating to this Agreement; provided, however, that a party may suspend performance of its undisputed obligations during any period in which the other party fails or refuses to perform its undisputed obligations.  Nothing in this Article is intended to relieve COMPANY from its obligation to make undisputed payments pursuant to Articles 4 and 6 of this Agreement.

13.5  <u>Statute of Limitations</u>.  The parties agree that all applicable statutes of limitation and time-based defenses (such as estoppel and laches) shall be tolled while the procedures set forth in Sections 13.3(a) are pending.  The parties shall cooperate in taking any actions necessary to achieve this result.

## · 14.  <u>MISCELLANEOUS</u>.

14.1  <u>Notice</u>.  Any notices required or permitted under this Agreement shall be in writing, shall specifically refer to this Agreement, and shall be sent by hand, recognized national overnight courier, confirmed facsimile transmission, confirmed electronic mail, or registered or certified mail, postage prepaid, return receipt requested, to the following addresses or facsimile numbers of the parties:

| | |
|---|---|
| If to M.I.T.: | Technology Licensing Office, Room NE25-230 |
| | Massachusetts Institute of Technology |
| | 77 Massachusetts Avenue |
| | Cambridge, MA  02139-4307 |
| | Attention:  Director |
| | Tel:     617-253-6966 |
| | Fax:     617-258-6790 |
| | |
| If to COMPANY | Dharmacon Research, Inc. |
| | 1376 Miners Drive |
| | Suite 101 |
| | Lafayette, CO 80026 |
| | Attention: Dr. Steven Scaringe |
| | Tel:     303-604-9499 |
| | Fax:     303-604-9680 |

All notices under this Agreement shall be deemed effective upon receipt.  A party may change its contact information immediately upon written notice to the other party in the manner provided in this Section.

14.2 <u>Governing Law</u>. This Agreement and all disputes arising out of or related to this Agreement, or the performance, enforcement, breach or termination hereof, and any remedies relating thereto, shall be construed, governed, interpreted and applied in accordance with the laws of the Commonwealth of Massachusetts, U.S.A., without regard to conflict of laws principles, except that questions affecting the construction and effect of any patent shall be determined by the law of the country in which the patent shall have been granted.

14.3 <u>Force Majeure</u>. Neither party will be responsible for delays resulting from causes beyond the reasonable control of such party, including without limitation fire, explosion, flood, war, strike, or riot, provided that the nonperforming party uses commercially reasonable efforts to avoid or remove such causes of nonperformance and continues performance under this Agreement with reasonable dispatch whenever such causes are removed.

14.4 <u>Amendment and Waiver</u>. This Agreement may be amended, supplemented, or otherwise modified only by means of a written instrument signed by both parties. Any waiver of any rights or failure to act in a specific instance shall relate only to such instance and shall not be construed as an agreement to waive any rights or fail to act in any other instance, whether or not similar.

14.5 <u>Severability</u>. In the event that any provision of this Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect any other provision of this Agreement, and the parties shall negotiate in good faith to modify the Agreement to preserve (to the extent possible) their original intent.

14.6 <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective permitted successors and assigns.

14.7 <u>Headings</u>. All headings are for convenience only and shall not affect the meaning of any provision of this Agreement.

14.8 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect to its subject matter and supersedes all prior agreements or understandings between the parties relating to its subject matter.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

**The EFFECTIVE DATE of this Agreement is** _Dec 21, 2001_.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY

By: _Lita Nelsen_

Name: LITA L. NELSEN DIRECTOR

Title: TECHNOLOGY LICENSING OFFICE

Dharmacon Research, Inc.

By: _Stephen Scaringe_

Name: STEPHEN SCARINGE

Title: CEO

21

## APPENDIX A

## JOINT PATENT RIGHTS

I.    United States Patents and Applications

USSN 60/265232 entitled "RNA Sequence-Specific Mediators of RNA Interference", by David P. Bartel, Phillip A. Sharp, Thomas Tuschl, And Phillip D. Zamore

USSN 09/821832 entitled "RNA Sequence-Specific Mediators of RNA Interference", by David P. Bartel, Phillip A. Sharp, Thomas Tuschl, And Phillip D. Zamore

II.    International (non-U.S.) Patents and Applications

PCT/US01/10188 entitled "RNA Sequence-Specific Mediators of RNA Interference", by David P. Bartel, Phillip A. Sharp, Thomas Tuschl, And Phillip D. Zamore

## APPENDIX B

## MAX PLANCK PATENT RIGHTS

I.    United States <u>Patents and Applications</u>

II.    <u>International (non-U.S.) Patents and Applications</u>

European Serial Number 00126325 entitled "RNA Interference Mediating Small RNA
       Molecules" by Thomas Tuschl, Sayda Elbashir and Winfried Lendeckel